**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (Cincinnati)**

| | | |
|---|---|---|
| DARNELL PATE ) | CASE NO. |
| 4303 Mt. Alverno Rd. ) | |
| Cincinnati, OH 45238 ) | JUDGE: |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT FOR DAMAGES AND** |
| ) | **INJUNCTIVE RELIEF** |
| VILLAGE OF NEW VIENNA ) | |
| Police Department ) | **Jury Demand Endorsed Herein** |
| 97 W. Main St. ) | |
| New Vienna, OH 45159 ) | |
| ) | |
| Defendant ) | |
| ) | |

Plaintiff Darnell Pate by and through undersigned counsel, as his Complaint against the Defendant, states and avers the following:

## PARTIES

1. Pate is a resident of the city of Cincinnati, Hamilton County, Ohio.

2. Defendant VILLAGE OF NEW VIENNA is a village police department, with its central location at 97 W. Main St., New Vienna, OH 45159.

3. Defendant VILLAGE OF NEW VIENNA is an incorporated municipality within the state of Ohio.

4. VILLAGE OF NEW VIENNA ("NVPD") is in charge of its police department, where Plaintiff was employed.

5. The relevant location of the events and omissions of this Complaint took place was at NVPD's location and at the surrounding areas it serves.

6. NVPD is, and was at all times hereinafter mentioned, Pate's employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII") and Ohio R.C. §4112.01, *et seq.*

7. Within 300 days of the adverse employment actions described herein, Pate dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Ohio Civil Rights Commission ("OCRC") against New Vienna, Charge No. 473-2022-01918 ("EEOC Charge").

8. On or about January 19, 2023, the EEOC issued and mailed a Notice of Right to Sue letter to Pate regarding his EEOC Charge.

9. Pate received the Notice of Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 200e-5(f)(1), which had been attached hereto as Plaintiff's Exhibit 1.

10. Pate has filed this Complaint on or before the 90-day deadline set forth in the Notice of Right to Sue letter.

11. Pate has properly exhausted all administrative remedies pursuant to 29 C.R.F. § 1614.407(b).

## JURISDICTION & VENUE

12. All of the material events alleged in this Complaint occurred in or around Clinton County, Ohio.

13. Therefore, personal jurisdiction is proper over Defendant pursuant to R.C. § 2307.382(A)(1), (2), and/or (3).

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, in that Plaintiff is alleging federal law claims under Title VII.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as Plaintiff's state law claims are so closely related to Plaintiff's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

17. Pate is a former employee of NVPD.

18. At all times noted herein, Pate was qualified for his position with NVPD.

19. At all times noted herein, Pate could fully perform the essential functions of his job, with or without a reasonable accommodation.

20. Pate worked for NVPD, ending as the Chief of Police, from June 24, 2021, until NVPD unlawfully terminated Pate's employment on or about June 18, 2022.

21. Pate is African American, placing him in a protected class for his race.

22. In December 2021, Pate was called to investigate a potential sexual assault.

23. Pate learned that the suspect in this potential sexual assault was former NVPD Chief of Police Frank Sedarat (Arab).

24. Pate informed New Vienna Mayor Kathi Stone (Caucasian) about the allegation.

25. Stone and New Vienna subsequently brought in the Sheriff to work on the case, while Sedarat was placed on paid, administrative leave.

26. After a long investigative process, Sedarat retired in good standing.

27. Pate was promoted to interim chief in the aftermath of Sedarat's retirement.

28. As there were only three active NVPD officers remaining after Sedarat's retirement, Pate acted within his hours as interim chief and hired a few more, including Robert Peters (Caucasian).

29. On or about January 21, 2022, a woman came to NVPD and claimed that her landlord had sexually assaulted and imprisoned her.

30. Peters investigated the claim and found that this particular landlord had many victims.

31. Peters brought this information to Pate, who directed Peters to the prosecutors.

32. The prosecutors told Peters that there was enough information for an arrest, but did not provide a warrant.

33. The prosecutors told Peters to make the arrest without a warrant.

34. On or about January 28, 2022, the landlord, Frank Music (Race Unknown), was arrested.

35. Pate and Peters told the prosecutors that the suspect did not live within the NVPD's jurisdiction.

36. The prosecutors told Pate and Peters to take the agency from the property jurisdiction with them when they arrested Music. The Wilmington Police Department joined in on the arrest as a result.

37. On or around January 31, 2022, Music was arraigned.

38. Around March 2022, Music claimed he had been wrongfully arrested due to the lack of a warrant.

39. On or around April 13, 2022, the municipal court agreed, and the case against Music was dismissed.

40. Stone found out about the loss of claims against Music and tasked the Sheriff with investigating the police department.

41. Pate fully cooperated with this investigation.

42. During typical NVPD investigations, police officers would be placed on paid administrative leave until the issue was resolved.

43. However, Pate and Peters were not placed on paid leave, as Village Solicitor Brett Rudduck had told Stone not to.

44. When the investigation began, Wilmington PD denied being present for the arrest, despite the fact that they conducted the arrest due to it being in their jurisdiction.

45. In early May 2022, Rudduck called Pate and stated that he needed to appear in court the following Tuesday due to the situation with Music.

46. Pate did not receive a subpoena for this court appearance but went anyway.

47. On or around May 3, 2022, Pate appeared in court with Rudduck, Music, and Music's attorney, Shawn Peterson, in front of Judge Mike Daugherty.

48. Judge Daugherty had prepared media, bailiffs, and four Wilmington County police officers in anticipation of arresting Pate for contempt of court.

49. Judge Daugherty asked Pate if he had received the subpoena or the court order to refund Music's tow costs.

50. Pate responded that he had received neither document.

51. Judge Daugherty then asked Pate questions about the case while the Wilmington New Journal was present.

52. The Wilmington New Journal subsequently published an article that deliberately showed Pate in a negative light.

53. Pate explained that he was unsure as to why there was no warrant, as it was not his case.

54. Judge Daugherty responded that all cases belonged to Pate because he was the Chief of Police.

55. Judge Daugherty then asked to bring Peters in, but as Peters was on vacation, this was rescheduled for a few weeks later.

56. On or around May 10, 2022, another news article came out against Pate.

57. Various police officers came to Pate as he began preparing for a contempt of court case.

58. These officers said that the judge had admonished the NVPD because Pate made the whole police department look bad.

59. These officers also informed Pate that Music was planning to file a lawsuit against New Vienna.

60. A few weeks later, the Sheriff asked to interview Pate and Peters about the situation.

61. Stone asked if Rudduck was planning to place Pate and Peters on administrative leave, but he said no.

62. In the meantime, the Village of New Vienna Council ("Council") received a letter from Peterson with a demand for $250,000, or he would bring a lawsuit for a civil rights violation.

63. On or around May 18, the Council and Stone called Pate.

64. Ohio law requires that when half of the Council shows up, they need to inform the public about the meeting.

65. The Council did not do this, making this an illegal meeting.

66. The Council and Stone met with Pate and tried to force him to resign.

67. Pate refused, so the Council told him to think about it and return with an answer on May 24, 2022.

68. The Council then told Pate that if he did not resign, they would terminate his employment instead.

69. On or about May 24, 2022, Pate sent a demand letter to the Council in exchange for his resignation.

70. Pate demanded a letter of good standing, a severance, payout of his accrued PTO, a neutral job reference, and a few other requests, mimicking what Sedarat had received for his resignation.

71. Due to Pate's refusal to resign, he was placed on administrative leave.

72. In a meeting with the Council and Stone, Pate asked if Peters, the Caucasian officer, was also being placed on administrative leave. This constituted a protected complaint of race discrimination.

73. The Council and Stone told Pate that Peters' status was between them and Peters, and did not respond to Pate's question.

74. Peters later called Pate to inform him that he was not placed on interim leave but was instead made interim Chief of Police.

75. Peters told Pate that he did not feel good about this and asked what he should do.

76. Pate told Peters to do whatever he thought was best.

77. Following this meeting, Stone approached Pate.

78. Pate informed Stone that he was not planning on resigning.

79. Pate also informed Stone that the meeting held on May 18 was illegal and that they needed to redo it.

80. On or around June 6, 2022, the Council, Stone, and Pate had another meeting which was posted correctly.

81. The Council went over the findings of the investigation and asked Pate how he wanted to proceed.

82. Pate handed in his demand and proposed resignation letter, were the Council to accept his demand.

83. Pate then stepped outside as the Council discussed.

84. When Pate stepped back in, the Council informed him that they had rejected his demand, but would not give him a bad reference.

85. The Council also stated that they would deal with Peters separately.

86. Pate informed the Council that he would not resign if his demand were not met.

87. Stone responded that Pate's employment was terminated.

88. Rudduck then informed Stone that Pate could appeal the termination in front of the Council, so they placed Pate on paid leave instead.

89. On or about June 7, 2022, Peters was placed on unpaid leave.

90. When NVPD disbanded a week later, Peters was allowed to retire in good standing. This was despite him not working at the police department for long enough to retire normally.

91. Stone called Pate to inform him that he would receive a termination letter soon.

92. On or about June 18, 2022, the termination letter arrived, constituting Pate's formal termination of employment.

93. The above facts demonstrate that NVPD engaged in a pattern and practice of race discrimination.

94. There was a causal connection between Pate's race and Defendant's termination of Pate.

95. NVPD's purported reason for Pate's employment termination was pretextual.

96. NVPD actually terminated Pate's employment in in an act of discrimination.

97. As a result of the above, Pate has suffered and will continue to suffer damages.

### COUNT I: RACE DISCRIMINATION IN VIOLATION OF R.C. §4112 et seq.

98. Pate restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

99. Throughout his employment, Pate was fully competent to perform his essential job duties.

100. Pate is a member of a statutorily-protected class under R.C. § 4112.02(A).

101. NVPD employees treated Pate differently than other similarly situated employees based on his race.

102. Pate was made to take sole responsibility for an arrest conducted by Peters, a Caucasian officer, and the Wilmington Police Department.

103. After this arrest, both Pate and Peters were placed under investigation.

104. During this investigation, Peters was made interim Chief of Police.

105. Peters was also allowed to retire and receive a letter of good standing, despite not being qualified for retirement.

106. Disparately, Pate was placed on paid leave and terminated with no letter of good standing.

107. Even Sedarat, the Arab former Chief of Police, was allowed to resign in good standing, despite having allegations of sexual assault against him.

108. Pate also asked for the same severance package that Sedarat had received when he resigned.

109. However, Pate was not given this severance package, despite the fact that Sedarat had received this package when he was being forced to resign for sexual assault allegations.

110. Among other discriminatory actions, NVPD terminated Pate's employment based on his race.

111. NVPD violated R.C. § 4112.02(A) *et seq.* by discriminating against Pate due to his race.

112. On or about June 18, 2022, NVPD terminated Pate without just cause.

113. Alternatively, Defendant's cited reason for Pate's termination was pretext.

114. At all times material herein, similarly situated non-African American employees were not terminated without just cause.

115. Defendant terminated Pate based on his race.

116. Pate's race was a determinative factor in Defendant's decision to take adverse actions against Pate.

117. Defendant violated R.C. § 4112.01 *et. seq.* when it terminated Pate based on his race.

118. Pate suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to R.C. § 4112.01 *et seq.*

119. As a direct and proximate result of Defendant's conduct, Pate has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT II: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

120. Pate restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

121. Throughout his employment, Pate was fully competent to perform his essential job duties.

122. Pate is a member of a statutorily-protected class under Title VII.

123. NVPD employees treated Pate differently than other similarly situated employees based on his race.

124. Pate was made to take sole responsibility for an arrest conducted by Peters, a Caucasian officer, and the Wilmington Police Department.

125. After this arrest, both Pate and Peters were placed under investigation.

126. During this investigation, Peters was made interim Chief of Police.

127. Peters was also allowed to retire and receive a letter of good standing, despite not being qualified for retirement.

128. Disparately, Pate was placed on paid leave and terminated with no letter of good standing.

129. Even Sedarat, the Arab former Chief of Police, was allowed to resign in good standing, despite having allegations of sexual assault against him.

130. Pate also asked for the same severance package that Sedarat had received when he resigned.

131. However, Pate was not given this severance package, despite the fact that Sedarat had received this package when he was being forced to resign for sexual assault allegations.

132. Among other discriminatory actions, NVPD terminated Pate's employment based on his race.

133. NVPD violated Title VII by discriminating against Pate due to his race.

134. On or about June 18, 2022, NVPD terminated Pate without just cause.

135. Alternatively, Defendant's cited reason for Pate's termination was pretext.

136. At all times material herein, similarly situated non-African American employees were not terminated without just cause.

137. Defendant terminated Pate based on his race.

138. Pate's race was a determinative factor in Defendant's decision to take adverse actions against Pate.

139. Defendant violated Title VII when it terminated Pate based on his race.

140. Pate suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to Title VII.

141. As a direct and proximate result of Defendant's conduct, Pate has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## **COUNT III: RETALIATION**

142. Pate restates each and every prior paragraph of this complaint, as if it were fully restated herein.

143. As a result of NVPD's discriminatory conduct described above, Pate complained about the discrimination he experienced.

144. On or about May 24, 2022, Pate made a protected complaint of race discrimination when he asked why Peters was not placed on leave as Pate had been.

145. On or about June 18, 2022, NVPD terminated Pate's employment.

146. The temporal proximity of Pate's protected complaint and the termination of his employment implies that he was terminated in retaliation for his protected complaint.

147. Defendant's actions were retaliatory in nature based on Pate's opposition to the unlawful discriminatory conduct.

148. Pursuant to Title VII and R.C. §4112.02(I), it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

149. Pate suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to Title VII and R.C. § 4112.01 *et seq.*

150. As a direct and proximate result of Defendant's retaliatory discrimination against and termination of Pate, he has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**DEMAND FOR RELIEF**

WHEREFORE, Pate demands from Defendant the following:

a) Issue a permanent injunction:

   i. Requiring Defendant to abolish discrimination, harassment, and retaliation;

   ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

   iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   iv. Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

   v. Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge his personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Pate for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Pate's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Matthew Bruce*
Matthew G. Bruce (0083769)
    Trial Attorney
Evan R. McFarland (0096953)
**SPITZ, THE EMPLOYEES' LAW FIRM**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, Ohio 45246
Phone: (216) 291-0244
Fax: (216) 291-5744
Email: matthew.bruce@spitzlawfirm.com
Email: evan.mcfarland@spitzlawfirm.com

*Attorneys for Plaintiff Darnell Pate*

## JURY DEMAND

Plaintiff Darnell Pate demands a trial by jury by the maximum number of jurors permitted.

*/s/ Matthew Bruce*
Matthew G. Bruce (0083769)
    Trial Attorney
**SPITZ, THE EMPLOYEES' LAW FIRM**